**UNITED STATES of America, Appellee,**

v.

**Abdul R. MUHAMMAD, Defendant–Appellant.**

**Docket No. 05–4923–CR.**

United States Court of Appeals, Second Circuit.

Argued: May 16, 2006.

Decided: Sept. 7, 2006.

Richard Power Maigret, Assistant United States Attorney (Stephan J. Baczynski, Assistant United States Attorney, on the brief, Kathleen M. Mehltretter, Acting United States Attorney, Western District of New York, of counsel), Buffalo, New York, for Appellee.

Kimberly A. Schechter, Assistant Federal Defender, Federal Defender's Office, Western District of New York (MaryBeth Covert, of counsel), Buffalo, New York, for Defendant–Appellant.

Before: MINER and WESLEY, Circuit Judges, and SWAIN, District Judge.*

MINER, Circuit Judge.

Defendant-appellant Abdul R. Muhammad appeals from a judgment of conviction and sentence for possession of a firearm as a convicted felon entered in the United States District Court for the Western District of New York (Skretny, *J.*) following a guilty plea. Prior to the plea, the District Court had denied a motion to suppress the assault rifle found in defendant's possession. That ruling was a consequence of the District Court's conclusion that the police had reasonable suspicion to stop Muhammad and that subsequent events justified the seizure of the rifle. On this appeal, Muhammad challenges the findings giving rise to the District Court's conclusion as well as the conclusion itself. We affirm for the reasons that follow.

## BACKGROUND

The background narrative that follows is based upon the factual findings of Magistrate Judge H. Kenneth Schroeder, to whom the suppression issue was referred for a Report and Recommendation. The findings were made following a hearing and are included in the Report and Recommendation filed by the Magistrate Judge and adopted by the District Court.

The events giving rise to the apprehension of Muhammad began with an anonymous cell phone call to the Buffalo Police 911 Call Center at approximately 11:13 P.M. on August 31, 2003. The female caller reported that a black man, attired in a white sweat suit and carrying a gun, was riding a bicycle west on Stanislaus Street toward Fillmore Avenue in the City of Buffalo. According to the caller, who never was identified, the gun was "out in the open." At approximately 11:16 P.M., the information provided by the caller was relayed by radio transmission to Buffalo police officers Richard Cruz and Joseph Langdon, who were on duty in a marked patrol car. The transmission specifically advised the officers that a cell phone caller had reported that "a black male dressed in white on a bike had a gun in his hand on Stanislaus headed toward Fillmore."

After receiving the call, the officers made their way toward Stanislaus Street. Driving east on Stanislaus, the officers were approaching the intersection of Rother Avenue when Officer Cruz "noticed a

* The Honorable Laura Taylor Swain of the United States District Court for the Southern District of New York, sitting by designation.

black male on a bike dressed in white, traveling west on Stanislaus." Activating the patrol vehicle's spotlight and overhead lights, Officer Cruz "attempted to slow down the suspect by approaching him in a forty-five degree angle toward the curb." The suspect increased the speed of his bicycle and drove it between the curb and the patrol car. Officer Cruz considered that "the [suspect] was attempting to flee." At that time, there was no one else in the vicinity, which the officers knew to be a high crime area.

According to Officer Cruz, Officer Langdon got out of the patrol car, chased the suspect and yelled at him to stop while Cruz tried to cut off the suspect's departure by driving the patrol car in reverse. Officer Langdon, in his version of events, said that he did not leave the vehicle but yelled at the suspect through the window: "hey, hold up." According to Langdon, the suspect did not stop, continued to ride his bicycle, and "kept trying to pass our vehicle." As Officer Cruz drove a short distance in reverse, another marked patrol car arrived, pulled in front of the suspect, and blocked his passage.

The second patrol car was occupied by Buffalo police officers Ronald Clark and Thomas Moran. When these officers first came upon the scene, Officer Clark saw the bicyclist ride past the passenger side of the other patrol car. According to Officer Clark, the bicyclist was moving at a high rate of speed and "trying to get away from the vehicle that was trying to stop him." Officer Moran also observed Muhammad's attempt to drive around the other patrol car, which he characterized as "fleeing the scene." The suspect was "boxed in" when Officer Clark positioned the car he was driving in front of the suspect, and Officer Cruz, driving his vehicle in reverse, was able to narrow the space between the two vehicles so that any

further movement of the bicycle was impossible. Accordingly, the bicycle was brought to what Officer Clark described as an "abrupt stop."

Exiting the patrol car, Officer Moran recognized the bicyclist as defendant Muhammad, with whom he had had a previous encounter and whom he described as a person who "gets very agitated" and is not cooperative. Officer Clark also had past experience with Muhammad and described him in similar terms and as one "likely to flee." Officer Langdon ran from his patrol car to the place where Muhammad had been stopped and was then "straddling his bike holding on to the handlebars." Muhammad dropped the bicycle as ordered, and Langdon grabbed one of Muhammad's arms and another officer took his other arm. The officers then escorted Muhammad to a patrol car, where he was constrained to stand with his hands on the trunk. It was at that point that Officer Cruz observed a black gym bag strapped to Muhammad's back.

In response to Officer Cruz's question as to the contents of the gym bag, Muhammad said that the bag contained a baseball bat. Aware of the time of night, the absence of baseball fields in the vicinity, and the fact that they were in a high crime area, the officers were concerned that the bag might contain a gun. The officers feared that even a baseball bat could be used against them. Accordingly, Officer Cruz "patted the bag down for officer safety," while Officer Langdon did a pat down of Muhammad's person. At the top of the closed bag, Cruz felt "some type of muzzle from some type of weapon." Opening the bag after removing it from Muhammad's back, Officer Cruz discovered within the bag an SKS 7.62 millimeter caliber assault rifle.

Approximately one minute and thirty seconds elapsed between the radio dispatch and the discovery of the rifle.

Following his arrest, Muhammad was charged in a single count indictment, dated September 25, 2003, with violating the provisions of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) in that

having been convicted on or about August 14, 1987 in the Erie County Court at Buffalo, New York, of a crime punishable by imprisonment for a term exceeding one year and having been convicted on or about September 15, 1992 in the New York Supreme Court at Buffalo, New York of a crime punishable by imprisonment for a term exceeding one year, unlawfully did knowingly possess, in and affecting commerce, a firearm, namely a Norinco, Model SKS, 7.62 X 39 mm. caliber, semiautomatic rifle, bearing serial number 94–58613.

By motion filed on December 12, 2003, Muhammad sought suppression of the seized rifle on the ground that it was taken in violation of his Fourth Amendment rights. Muhammad contended that the police had no reasonable suspicion of the sort that would justify stopping him and that the consequent search of his gym bag and seizure of its contents were unlawful. The motion was referred to Magistrate Judge Schroeder for a Report and Recommendation, and after taking testimony and receiving exhibits in evidence, the Magistrate Judge recommended that the motion be denied.

In rejecting Muhammad's contention that the police officers lacked reasonable suspicion to stop him, the Magistrate Judge made the following determination:

Upon consideration of the totality of the circumstances presented to the police officers at this point, *to wit*, the detailed description of the suspect, the caller's report of observing the suspect carrying the gun out in the open, the negligible amount of time which elapsed between the call and the officers' response, the fact that no one else was in the vicinity, the high incidence of crime in the neighborhood, and the suspect's attempt to flee when the police officers indicated their desire to speak with him, the Court finds there was reasonable suspicion to justify the stop.

With regard to the search of the gym bag and the seizure of its contents, the Magistrate Judge found

that upon stopping the defendant, the police officers did nothing more than was necessary to dispel or confirm their suspicion. They removed the defendant from his bicycle and frisked both his person and the gym bag which was on his back. As he grabbed the top of the bag, Officer Cruz felt the muzzle of a gun inside the bag, thereby warranting the removal of the weapon from [the] bag.... It is also important to note that less than two minutes elapsed from the initial radio call to the discovery of the rifle. Thus, both the duration of the seizure and the scope of the search comported with its justification.

After receiving Muhammad's objections, hearing the arguments of counsel, and conducting a *de novo* review of the Report and Recommendation, the District Court found "no legal or factual error." Accordingly, the District Court rejected Muhammad's objections, adopted the Report and Recommendation in its entirety and denied the motion to suppress. Thereafter, Muhammad entered a conditional plea of guilty, reserving the right to appeal the order denying his motion to suppress pursuant to Fed.R.Crim.P. 11(a)(2). By judgment entered on August 31, 2005, Muhammad was sentenced to a term of imprisonment of 100 months, a period of supervised release of three

years upon his release from imprisonment, and an assessment of $100. This timely appeal, challenging only the denial of the suppression motion, followed.

## ANALYSIS

■ The "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," conferred by the Fourth Amendment, is not infringed where police officers conduct an investigative stop, based on reasonable suspicion, of a person suspected of criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoting U.S. Const. amend. IV). The suspicion that criminal activity is afoot must be both reasonable and articulable, *id.* at 30, 88 S.Ct. 1868, and an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity is insufficient to justify even a brief detention for the purpose of investigation, *id.* at 27, 88 S.Ct. 1868. What is required is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

■ In our review of reasonable suspicion determinations, we assess the totality of the circumstances supporting the investigatory stop. *Id.* at 417–18, 101 S.Ct. 690. We make such an assessment in order to decide whether the officer's suspicion of wrongdoing has an objective and particularized basis. *Id.* An officer may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that 'might well elude an untrained person.'" *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal citation omitted). When the noticed presence of officers provokes a suspect's head-

long flight in a high crime area, the officers are justified in suspecting criminal activity on the part of the suspect and a *Terry* stop is warranted. *See Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Under these circumstances, "the determination of reasonable suspicion [is] based on common sense judgments and inferences about human behavior." *Id.* But only "the facts available to the officer at the moment of the seizure" may be evaluated in our review of the determination. *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868.

■ Whenever an anonymous tip first alerts police to possible wrongdoing, the question to be answered is whether the "tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (internal citation omitted). The factual background in *J.L.* is substantially similar to the factual background in the case we review here. There is, however, one significant factual difference between the two cases that compels an outcome in this case different from the outcome in *J.L.,* as will be seen.

The events leading to the investigatory stop in *J.L.* were succinctly stated by the Supreme Court as follows:

> On October 13, 1995, an anonymous caller reported to the Miami–Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. So far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant. Sometime after the police received the tip—the record does not say how long—two officers were instructed to respond. They arrived at the bus stop about six minutes

later and saw three black males "just hanging out [there]." One of the three, respondent J.L., was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements. One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized the gun from J.L.'s pocket. The second officer frisked the other two individuals, against whom no allegations had been made, and found nothing.

*Id.* at 268, 120 S.Ct. 1375 (internal citations omitted; alteration in original).

When charged under Florida law with carrying a concealed weapon without a license and possession of a firearm while under the age of eighteen, J.L. moved to suppress the gun as seized in violation of the Fourth Amendment. *Id.* at 269, 120 S.Ct. 1375. Ultimately, the Florida Supreme Court held that the search was invalid, and the Supreme Court agreed. *Id.* Critical to the Court's determination that reasonable suspicion for stopping and searching J.L. was lacking was the Court's observation that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271, 120 S.Ct. 1375.

The Court rejected Florida's arguments that (1) the tip should have been considered reliable and therefore a basis for reasonable suspicion because the police actually found a young black male attired in a plaid shirt at the bus stop; and (2) that the *Terry* analysis should be modified by a "firearm exception" that would allow a stop and frisk whenever the tip alleged the possession of an illegal firearm. *Id.* at 271–73, 120 S.Ct. 1375. The first argument was rejected because a suspect's physical attributes do not demonstrate a tipster's knowledge of concealed criminal activity, and the second argument was rejected because a firearm exception would enable false anonymous calls for the purpose of harassment and would lead to an expansion of the categories of cases in which exceptions would be allowed. *Id.*

■ In the case before us, there also was an anonymous tip that lacked any indicia of reliability. Although the anonymous informant proffered that she had seen the gun in the bicyclist's hand, the responding police officers did not observe any gun. Indeed, the only aspects of the caller's information that were corroborated by their initial observations were that a black man in white clothing was riding a bicycle on a particular street. Absent any other information indicative of the caller's reliability, such as the provision of information predictive of activity suggesting criminal involvement, or prior experience with the particular informant, the information known to the police at the time of their initial observation of Muhammad was insufficient to justify stopping him. *See id.* at 271, 120 S.Ct. 1375. Accordingly, if the officers who stopped and frisked Muhammad had done so solely on the basis of the report made by the anonymous caller and transmitted to them by the Buffalo Police 911 Call Center, they would have had an insufficient basis for a *Terry* stop because their suspicions would be deemed unreasonable.

■ However, because reasonable suspicion is "measured by what the officers knew before they conducted the search," *id.,* personal observations made by the officers that corroborate information furnished by an unknown and unaccountable tipster may provide the basis for a reasonableness finding. *Cf. id.* at 270, 120 S.Ct. 1375. Such corroboration may come in the form of an officer's observa-

tion of flight in a high crime area. *See Wardlow*, 528 U.S. at 124, 120 S.Ct. 673. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* Moreover, "[h]eadlong flight—whenever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention. *See Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). "But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673.

■ Muhammad's detention was initiated when Officer Cruz activated the patrol vehicle's spotlight and overhead lights. While Cruz's conduct may be considered an unreasonable order to stop since reasonable suspicion was lacking at that point, it is the rule "that an unreasonable order to stop does not violate the Fourth Amendment and that the grounds for a stop may thus be based on events that occur after the order to stop is given." *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir.2005) (citing *California v. Hodari D.*, 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), as providing "strong impli[cation]" for this rule). In *Swindle*, the defendant was driving an automobile when he was ordered to stop by the activation of patrol car lights. He thereafter crossed a double yellow line, drove the wrong way on a one-way street, threw a bag of cocaine from the car, and was seized as he fled on foot. *Id.* at 564. We concluded that "Swindle was seized only when the police physically apprehended him" and that the discarded

drugs, which he was charged with having possessed with intent to distribute, were "not the fruit of a Fourth Amendment seizure." *Id.* at 573.

Similarly, Muhammad was not seized until he was physically restrained when the patrol cars came together and the officers were able to take him by the arm as he straddled his bicycle. *Cf. United States v. Brown*, 448 F.3d 239, 252 (3d Cir.2006) (finding that a seizure occurred when the suspect was told that a robbery victim was arriving to identify him as a suspect). The Magistrate Judge found that Muhammad had increased the speed of his bicycle in an effort to pass between the patrol car and the curb and thereby evade apprehension. It was only when he was "boxed in" by the second patrol car that his attempt to flee was foiled. The officers' personal observation of Muhammad's evasive conduct was the additional factor, missing in *J.L.*, that corroborated the anonymous tip and provided the objective manifestation that criminal activity was afoot. The totality of the circumstances, which included the detailed description by the anonymous tipster, the rapid identification of the bicyclist as described in the tip, and the location of Muhammad in a high crime area, when combined with the officers' personal observations and their own experience and specialized training, provided a sufficient basis for the conclusion that the officers who stopped Muhammad did so on the basis of a reasonable suspicion that he was engaged in criminal activity.

■ Once the officers properly stopped Muhammad, they were entitled to conduct a patdown search following Muhammad's problematic response to their query as to the contents of the gym bag strapped to his back. Where an officer

makes reasonable inquiries, and where nothing in the initial stages of the en-

counter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Terry,* 392 U.S. at 30, 88 S.Ct. 1868.

██ The officers here had a tip that the bicyclist had a gun, but even a baseball bat, which Muhammad said was in the bag, would be a danger to them. The patdown of the bag, of course, resulted in the seizure of the firearm sought to be suppressed. A patdown is reasonable to "allow the officer to pursue his investigation without fear of violence." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). At the time they conducted the patdown, the officers also had identified Muhammad from previous encounters as one who "gets very agitated," is not cooperative, and is "likely to flee." These factors reinforced their determination to examine the bag's contents. *See Holeman v. City of New London,* 425 F.3d 184, 192 (2d Cir.2005) (holding that patdown was proper where police were in high crime area in middle of the night with convicted felon who was acting suspiciously). The District Court did not err in denying the motion to suppress the weapon.

In urging reversal of the District Court's denial of suppression, Muhammad contends that "[t]he facts elicited at the suppression hearing made clear that [he] swerved his bicycle to avoid colliding with a patrol car." He insists that there was no evidence of flight and that the finding that he was so engaged at the time of his seizure should not be factored into the reasonable suspicion analysis. In support of his contention, Muhammad points to the following items in the suppression hearing:

Officer Langdon's testimony that Officer Cruz was driving his patrol car at a speed of 15–20 miles per hour when he pulled the car into Muhammad's path and his testimony that he did not know whether Muhammad swerved his bicycle to avoid being hit by the patrol car but acknowledged it was possible; Officer Cruz's testimony that Muhammad's reaction, when the police car pulled in front of him, was to try to get away from the car; and Officer Clark's testimony that he did not realize that Officer Cruz's vehicle had veered into Muhammad's path. Muhammad also supports his contention by reference to a statement made by the Magistrate Judge in responding to an objection: "He swerved to avoid the car."

██ While determinations of reasonable suspicion are reviewed *de novo,* "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by ... law enforcement officers." *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We are therefore constrained to accept the factual findings of the District Court unless clearly erroneous, viewing them in the light most favorable to the Government. *See United States v. Casado,* 303 F.3d 440, 443 (2d Cir.2002).

██ The factual finding made by the Magistrate Judge and adopted by the District Court cannot be classified as clearly erroneous with respect to Muhammad's attempt at flight, since it had adequate support in the testimony of the witnesses. Officer Cruz was emphatic in his testimony that Muhammad was trying to get away, and he testified on cross-examination that Muhammad did not swerve for the purpose of avoiding collision with the patrol car as he rode his bicycle. Officer Langdon described how Muhammad swerved around the front bumper of the patrol car in an

attempt to flee. Although he testified that it was *possible* that Muhammad swerved to avoid being hit, he clearly testified that when Muhammad speeded up to pass the car, he appeared to be fleeing. The act of swerving, of course, was not inconsistent with an attempt to flee. Officer Clark testified that Muhammad "was trying to get away from the other vehicle that was trying to stop him" and was "attempting to get past that vehicle and move onward." There was no error, let alone clear error, in the significant finding of the Magistrate Judge that "the suspect[ ] attempt[ed] to flee when the police officers indicated their desire to speak with him."

## CONCLUSION

The judgment of the District Court is affirmed in all respects.