**UNITED STATES of America,**

v.

**Nathan TORRES, Defendant.**

**No. 16–cr–767 (RJS)**

United States District Court,
S.D. New York.

Signed 05/09/2017

Gillian Grossman, U.S. Attorney's Office, Southern District of New York, New York, NY, for United States of America.

Jennifer Elaine Willis, pro hac vice, Federal Defenders of New York, New York, NY, for Defendant.

## OPINION & ORDER

RICHARD J. SULLIVAN, District Judge:

Now before the Court is Defendant Nathan Torres's motion to suppress physical evidence and post-arrest statements obtained by law enforcement officers from Defendant in the course of an investigative stop and frisk. For the reasons stated below, the Court denies the motion.

1. In deciding this motion, the Court considered the parties' written submissions (Doc. Nos. 12, 13, 16, 17, 21, 22), the transcript from the suppression hearing ("Hr'g Tr."),

## I. BACKGROUND

According to the indictment, which was returned on November 17, 2016, Defendant is charged with possessing a firearm after having been previously convicted of a felony in violation of 18 U.S.C. § 922(g). (Doc. No. 6.) On January 11, 2017, Defendant filed the present motion (Doc. No. 11), asserting that law enforcement officers lacked reasonable suspicion to stop and frisk him on the evening of September 17, 2016. The Court thereafter held a suppression hearing, at which the government called three New York City police officers—Officer Alexis DeJesus, Sergeant Brian Manning, and Sergeant Stephen Schoefer—concerning the events of September 17, 2016. The Court also received several exhibits into evidence. Following the hearing, the parties filed additional written submissions, and on March 10, 2017, the Court heard additional oral argument from counsel.[1]

### A. Summary of the Hearing Testimony

Each officer has served in the New York City Police Department (NYPD) for several years, with Manning and Schoefer rising to the rank of sergeant. (Hr'g Tr. 8:15, 73:5–6, 73:11–17, 121:13–14.) All three officers work in the anticrime unit of Patrol Borough Bronx. (See Hr'g Tr. 8:18–19, 73:11–17, 121:5–7.) At least two of the officers, DeJesus and Schoefer, were previously assigned to the 44th Precinct in the Bronx, an area that includes the site of Defendant's stop, frisk, and arrest. (See Hr'g Tr. 14:5–19, 121:8–9.)

On the night of September 17, the police officers were on patrol in an unmarked police car. (Hr'g Tr. 9:5–7, 9:15–21, 74:1–15.) They were dressed in plainclothes. (Hr'g Tr. 9:10–14, 74:6–7.) At approximate-

the transcript from the post-hearing argument ("Arg. Tr."), the government's exhibits ("GX"), and Defendant's exhibit ("DX").

ly 10:00 p.m., the officers received a report of "shots fired" in the vicinity of 167th Street and Clay Avenue in the Bronx. (Hr'g Tr. 11:23–13:18, 77:2–25.)

Shortly before midnight, the officers were together in a car headed westbound on 167th Street. (*See* Hr'g Tr. 13:21–14:2, 16:10–14.) Manning was driving the car, Schoefer was sitting in the front passenger seat, and DeJesus was in the back seat. (Hr'g Tr. 10:18–23, 74:16–18, 122:11–13.) As their vehicle turned the corner onto Clay Avenue, the officers observed Torres and an unidentified individual in conversation on the sidewalk at the southeast corner of the intersection. (Hr'g Tr. 16:1–14, 76:11–23, 121:25–122:14.) Defendant was wearing a t-shirt and sweatpants, and he was carrying a plastic bag and a sweatshirt. (Hr'g Tr. 17:2–24, 78:7–12, 122:11.) As the police car turned onto Clay Avenue, Torres made eye contact with the officers in the vehicle, which came to a stop. (Hr'g Tr. 18:10–14, 78:16–21.) According to DeJesus, Torres's "eyes opened up and he froze," looking "afraid." (Hr'g Tr. 18:10–11, 18:23–25.) Torres then ended his conversation and began walking in the opposite direction, away from the police officers' vehicle. (Hr'g Tr. 18:15–17, 122:11–14.) In response, Manning backed up the patrol car to follow Torres, who then reversed direction again and began walking south along Clay Avenue, away from the officers' car. (Hr'g Tr. 18:12–17, 19:24–20:3, 80:19–23.)

Once the officers had backed up to the corner, the car stopped and the officers testified that DeJesus exited the vehicle and identified himself as a police officer. (Hr'g Tr. 21:10–21:14, 83:16–84:17, 85:14–19.) At that moment, Torres started running southbound on Clay Avenue (Hr'g Tr. 21:16–23, 83:16–18), whereupon DeJesus pursued Torres down the sidewalk on foot (Hr'g Tr. 23:9). Manning, still behind the wheel of the police car, then drove south

on Clay Avenue alongside Torres, and Schoefer, who had gotten out of the vehicle, ran down the street following the patrol car. (Hr'g Tr. 28:6–7, 84:18–85:13, 123:22, 124:21–23.) While pursuing Torres, Manning identified himself as a police officer and ordered Torres to stop running. (Hr'g Tr. 86:1–12.) The officers testified that as Torres ran, his right hand remained close to his right pocket. (Hr'g Tr. 23:10–11, 25:18–26:13, 87:16–88:7.) In particular, Manning testified that "as the fleeing began, [Torres] grabbed onto that pocket and was holding onto it as he was running," and he "would not take it off during the pursuit." (Hr'g Tr. 87:1–3.) During the flight, Manning, believing that Torres was about to remove a gun from his pocket, shouted, "If you pull it out, I will shoot you." (Hr'g Tr. 88:7–12.) Manning also stated that he observed Torres's "pocket kind of [sit] a little heavy." (Hr'g Tr. 88:23–24.)

Once Torres neared the intersection of 166th Street and Clay Avenue, he threw himself on the pavement, discarded the bag he had been carrying, and lay facedown on the ground. (Hr'g Tr. 26:15–19, 29:2–18, 89:3–4.) DeJesus immediately approached Torres and frisked his right pants pocket (Hr'g Tr. 26:25), which contained a hard object that DeJesus thought felt like a gun. DeJesus thereafter removed a loaded .32 caliber semiautomatic firearm from Torres's pocket (Hr'g Tr. 27:7–10, 30:20–22, 89:7–10, 89:20–90:1; GX 2), at which time Torres was placed under arrest. (Hr'g Tr. 37:7–8.) Torres later made inculpatory statements to the police officers. (Hr'g Tr. 38:6–7, 90:5–9.)

### B. Surveillance Videos

In addition to hearing the testimony of the three officers, the Court received several exhibits into evidence. Of consequence to this motion are three surveillance videos, apparently taken from secu-

rity cameras positioned along the front of residential buildings on Clay Avenue that captured different parts of Torres's flight and the officers' pursuit. Two of the videos, GX 3 and GX 4, were introduced by the government and one, DX 1, was introduced by Defendant.

The first video, GX 3, is just under four minutes long. The video was taken by a camera that apparently faces north up Clay Avenue. In the video, two parked cars can clearly be seen alongside the sidewalk in the frame. When the video begins, an individual with his back to the camera, identified as Torres, can be seen in a white t-shirt and red sweatpants, talking to a person who cannot clearly be seen. While standing on the corner, Torres paces and turns several times, revealing a slight bulge in his right pants pocket between his thigh and knee. Toward the end of the video, a car—identified by the officers as their unmarked police car—can be seen making a left turn onto Clay Avenue, whereupon Torres wanders off the screen toward the right. He then reappears in the frame and shortly thereafter takes off running down the block. An individual, identified as DeJesus, appears behind Torres in a black and white striped shirt and pursues him. Both Torres and DeJesus quickly run out of the frame.

The second video, DX 1, is thirty-five seconds long. This footage is also taken from a camera pointing northbound up Clay Avenue, but this camera was positioned farther down the block from the one that recorded GX 3. As a result, a greater extent of the street and sidewalk—approximately seven parked car lengths—is in the frame. The corner, where Torres's flight began, cannot clearly be seen, so when figures first appear in the frame, Torres's flight and DeJesus's pursuit are already in progress. During the chase, an object in Torres's right pants pocket can be observed swinging as Torres runs down the street. The chase can be seen in this video for less than five seconds.

The last video, GX 4, is the only one of the three taken from a southbound-facing camera. The video is approximately two-and-a-half minutes long. About five car lengths of sidewalk is illuminated and clearly visible in the forefront of the frame, but more of the darkened street can be seen along the periphery. This video opens with a child in a stroller and two adults unloading a double-parked car. Toward the end of the video, Torres and DeJesus run into the frame as the camera catches their chase from behind. The officers' car can also be seen driving alongside Torres and DeJesus. Torres can be seen running in this video for approximately five seconds. While the end of the pursuit is not captured by the surveillance footage, the video does show the police car's brake lights go on at the end of the block, presumably where Torres flung himself onto the street and the chase ended.

## II. Legal Standard

Police officers may institute a brief investigative *Terry* stop if they hold a " 'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). In the course of a *Terry* stop, police officers may conduct a limited frisk for weapons if the officers have a reasonable suspicion that the suspect is "armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

"Reasonable suspicion requires more than an 'inchoate and unparticularized suspicion or hunch.' Police 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest].' Like probable cause, reasonable suspicion is determined based on the totality

of the circumstances[,] but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Elmore*, 482 F.3d 172, 178–79 (2d Cir. 2007) (alterations in original) (first quoting *Alabama v. White*, 496 U.S. 325, 329–30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), then quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and finally quoting *United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). When weighing whether reasonable suspicion is present, courts are to consider "commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Moreover, courts must "view the totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014). This includes considering law enforcement officers' "own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

### III. Discussion

Here, the parties dispute whether the officers had reasonable suspicion to stop *or* frisk Defendant. The Court will address each in turn.

### A. The Stop

For Torres's stop to be valid, the officers must have had reasonable suspicion that criminal activity was taking place, or would soon take place, at the time Torres threw himself onto the ground near the intersection of 166th Street and Clay Avenue. *See United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) ("The grounds for a stop must exist at the time of the seizure."). A suspect is not seized within the meaning of the Fourth Amendment until the law enforcement agents exert physical force or the suspect otherwise yields to the police officers' authority. *See California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Torres's stop can thus be validly grounded in reasonable suspicion even if there was no such suspicion at the moment he was first ordered to stop; instead, the facts supporting reasonable suspicion can be developed in the interim period between the order to stop and the ultimate seizure. *See United States v. Muhammad*, 463 F.3d 115, 122–23 (2d Cir. 2006); *United States v. Swindle*, 407 F.3d 562, 567–68 (2d Cir. 2005).

Here, the record is clear that Torres was stopped in an area known for gang-related activity. Each officer testified about his experience in the Bronx anti-crime unit and the 44th Precinct, of which the intersection at issue is a part. Each testified that the area is a frequent and consistent site of gang activity. (Hr'g Tr. 14:9–22, 38:15–20, 90:14–91:9.) Thus, the Court finds that the officers' testimony was credible as to both their experience working on that stretch of Clay Avenue and their understanding that it is a high crime area. And while Torres's "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable particularized suspicion that a person is committing a crime," it is a "relevant contextual consideration[ ] in a *Terry* analysis." *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673.

Not only did the stop occur in an area known for gang activity, but it also took place after Torres attempted to flee from the police officers. It is true that "[a]n individual approached by an officer who has no reasonable suspicion of wrong-

234

doing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention." *Muhammad,* 463 F.3d at 123. However, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and "[h]eadlong flight . . . is the consummate act of evasion." *Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 (citation omitted). Of course, Defendant argues that his flight does not connote evasion. To the contrary, Defendant asserts that the officers were in plainclothes, emerged from an unmarked car, and did not identify themselves as the police. He therefore argues that there are perfectly legitimate—and innocent—reasons for an individual to run from approaching strangers in the middle of the night, particularly in a high crime area. However, while that may be true as a general matter, the Court has little difficulty concluding that Torres was well aware that the individuals in the car were in fact law enforcement officers, and that his headlong flight supports a finding of reasonable suspicion.

First, Manning and DeJesus were both confident that Torres recognized them as police officers even before DeJesus exited the vehicle. They also testified that they are often identified as police officers when they are on patrol, even in plainclothes. (Hr'g Tr. 21:2–6, 44:16–45:1, 79:18–80:1.) They further testified that they were on patrol in a Ford Fusion, a car that is commonly used as an unmarked police vehicle and is easily and commonly recognized as such. (Hr'g Tr. 20:23–21:6, 44:16–45:1, 75:10–12.) And the surveillance videos also support the conclusion that Torres recognized the officers as the police before he began his flight. For example, GX 3, which captures the start of the interaction, shows Torres turn his eyes directly toward the police car and continue watching it until it came to a stop on Clay Avenue. (GX 3 at 3:00.) Thereafter, he almost immediately turns to walk toward the corner

and away from the police car, while the individual Torres was in conversation with remains in place. When the police vehicle begins to back up in the direction toward which Torres was walking, Torres stops and changes direction again, all the while observing the unmarked police car. (*Id.* at 3:15.) Finally, Torres takes off running as soon as DeJesus exits the vehicle. (*Id.* at 3:17.) From this video, it appears obvious that Torres recognized the car as one carrying police officers and ran as soon as DeJesus exited the vehicle, believing him to be a police officer. Indeed, DeJesus testified that he identified himself as a police officer at the very moment he exited the Ford Fusion. (Hr'g Tr. 21:10–21:14.) And Manning stated that he too identified himself as a police officer when he drove alongside Torres as he ran. (Hr'g Tr. 83:16–84:17, 85:15–19, 86:1–15.)

Defendant attempts to undermine the credibility of DeJesus and Manning on this point, noting that De Jesus made no mention of such an announcement in his memo book (Hr'g Tr. 115:6–8), in his statements to the Assistant District Attorneys originally assigned to the case, or in his testimony before the state grand jury. (Hr'g Tr. 56:10–58:6, 60:3–6, 62:3–6, 62:21–63:4.) Defendant also correctly points out that Schoefer had no recollection of "whether or not [DeJesus] said anything . . . either way" (Hr'g Tr. 124:13–14) and that the surveillance videos, which do not include any audio of the interaction, provide no corroboration of the officers' account. Nevertheless, the Court found DeJesus and Manning to be credible on this point, and Defendant has offered no evidence from any witness contradicting the officers' account. Moreover, even if DeJesus and Manning did not actually identify themselves as police officers, the Court would still find that Defendant recognized the officers to be law enforcement immediately prior to, and during the course of, his

flight based on the officers' other testimony and the video footage.

Accordingly, because Torres (1) was present in a high crime area late at night and (2) fled from individuals whom he knew to be police officers, the officers had reasonable suspicion to make the stop. While either factor alone might not be enough to support a finding of reasonable, particularized suspicion, *see Wardlow*, 528 U.S. at 124, 120 S.Ct. 673, together they serve as facts sufficient to cross the threshold of reasonable suspicion to justify a stop, *see, e.g., id.*; *Muhammad*, 463 F.3d at 122–23; *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003).

### B. The Frisk

The government contends that the officers' frisk of Torres was similarly supported by reasonable suspicion. Specifically, the government points to the factors considered above, as well as the fact that, less than two hours after receiving a report of shots fired, the officers observed Torres clutching, or having his hand near, his pocket as he ran away from the police officers. As noted above, DeJesus testified that while Torres was running, "his hand [was] always near his pocket" (Hr'g Tr. 25:18–19), his hand was "hovering over his pocket" (Hr'g Tr. 26:2), and his hand was not swinging as he ran (Hr'g Tr. 26:5–10). Manning similarly testified that "as the fleeing began, [Torres] grabbed onto that pocket and was holding onto it as he was running" (Hr'g Tr. 87:1–2), that he "would not take [his hand] off during the pursuit." (Hr'g Tr. 87:2–3.) Manning later reiterated that before the pursuit began, Torres's "[r]ight hand was free," but when Torres began running, "that's when the individual grabbed onto his pocket." (Hr'g Tr. 88:4–5.) Clearly, this testimony, if credited, would provide the requisite reasonable suspicion of Defendant's dangerousness to justify the frisk. *See, e.g., United States v. Lopez*, 321 Fed.Appx. 65, 67–68 (2d Cir.

2009) (upholding frisk where officer observed defendant reaching toward his pocket); *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (upholding frisk where officer observed defendant adjust object that seems like a gun along waistline); *Abdurrahman v. Henderson*, 897 F.2d 71, 74–75 (2d Cir. 1990) (observing defendant "move his hands frantically through his pockets"). Defendant concedes as much. (Arg. Tr. 33:24–34:4.)

However, Defendant argues that the officers' testimony on this issue was not credible, and in fact was contradicted by the video footage introduced at the hearing. Defendant asserts that, in contrast to the officers' testimony, GX 3 and DX 1, which together show the first several seconds of Torres's flight, do not show Torres grabbing his pocket. To the contrary, the videos show the Defendant taking off running, carrying a bag in his left hand, and pumping his right arm as one would expect of someone attempting to run quickly. At no point in these two videos does Torres appear to clutch—or have his hand hovering over—his pocket.

But while there is no doubt that the testimony of Manning and DeJesus is contradicted to some extent by the videos, which reflect that—for at least the first few seconds of his flight—Torres did not reach for or grab his right pants pocket, the question for the Court is whether the discrepancy between the videos and the testimony is so complete that the officers' testimony regarding Torres's pocket must be wholly disregarded as a fabrication, or whether the officers' testimony can be reconciled with the videos and the other evidence introduced at the hearing.

Here, the Court found the officers to be credible as they delivered their testimony in the suppression hearing. And while the video footage does call into question some of the officers' testimony, it does not whol-

ly negate the Court's initial impression that Manning and DeJesus recounted the events of September 17, 2016 honestly and to the best of their recollection. Indeed, putting to one side the apparent discrepancies regarding Torres's hands at the beginning of his flight, the video actually corroborates much of the other testimony offered by the officers at the hearing. For example, the videos largely confirm the officers' account of their arrival at the scene, their descriptions of Torres's clothing and the items he was carrying, their observations of Torres's behavior in relation to the unmarked car, the timing of his flight, and their pursuit thereafter, including the fact that DeJesus gave chase on foot while Manning drove alongside Torres in the unmarked Ford Fusion. Given this general corroboration, as well as the officers' internally consistent testimony, the Court finds it more likely that the officers misremembered the exact point during the very brief flight at which they saw Torres clutch his pocket, but that they nonetheless observed him grabbing his pocket in a way that aroused a suspicion that he was armed.

Moreover, while the officers' testimony is undermined by some of the surveillance evidence, other portions of the video evidence is consistent with the officers' testimony regarding the location of Defendant's hands during his flight. Significantly, the videos only show the first approximately five seconds of Torres's flight, but the pursuit went on for some time after that, as evidenced by GX 4. In that video, which shows Torres from behind, the angle of Torres's arm seems to be bent downwards and does not seem to be pumping as vigorously as it was in GX 3 and DX 1, which show Torres at the very start of his flight. GX 4 further indicates that, by the time he had reached the middle of the block on Clay Avenue, Torres was not running in the manner one would expect from someone trying to run as fast as possible, and that his right arm appeared to be dangling in the vicinity of his pocket. To be sure, GX 4 does not show Torres from the front, and it does not provide a clear view of his hands. Nevertheless, while GX 4 does not conclusively show Defendant clutching his pants pocket, it is at least consistent with the officers' testimony to that effect.

It bears noting that other aspects of the officers' testimony—which were not observable in the videos—were consistent with their assertions that Torres reached for his pocket while attempting to flee. For example, Manning testified that he threatened to shoot Torres if he pulled out his gun. Although Manning acknowledged that the statement was a "bluff" and that he was not inclined, or in a position, to actually shoot at Torres, the statement—which the Court found to be credible—demonstrated at least a contemporaneous subjective believe that Defendant was armed.

Finally, Manning also testified that as Torres ran, his "pocket kind of sat a little heavy," making Manning believe that Torres had a firearm. (Hr'g Tr. 88:23–89:1.) Significantly, this testimony is corroborated by portions of the surveillance videos. For example, in GX 3, while Torres stands at the corner, there appears to be a bulge in his right sweatpants pocket that is consistent with the size and weight of a handgun. (E.g., GX 3 at 2:27.) Similarly, in DX 1, as Torres runs down the block, a weighty object in his pocket seems to be swinging back and forth above his right knee. (E.g., DX 1 at 0:17.) These sections of the videos support Manning's testimony that the appearance of Torres's pocket contributed to his belief that Torres possessed a firearm. See, e.g., United States v. Hamilton, 978 F.2d 783, 785 (2d Cir. 1992) (finding frisk to be valid where the officers observed an "unusual bulge" in defendant's pocket).

Taken together, the evidence at the hearing persuades the Court that the officers—though undoubtedly mistaken with respect to certain details concerning the immediate commencement of Defendant's flight—were not lying to the Court or otherwise unworthy of belief. Thus, in light of the facts that Defendant was observed in a high crime area, less than two hours after a report of shots fired, that he fled from police officers who identified themselves and were recognizable as such, that his right pants pocket hung heavy in a manner that was consistent with the weight and size of a firearm, and that his right hand hovered near his right pocket for at least a portion of the time in which he was running from the police, the Court finds that the officers had reasonable suspicion to justify a frisk of Defendant's right front pocket at the conclusion of his flight.

## IV. CONCLUSION

The reasonable suspicion standard is designed to balance individual liberty interests against the need for providing law enforcement officers flexibility "in dealing with the rapidly unfolding and often dangerous situations on city streets." *Terry*, 392 U.S. at 10, 88 S.Ct. 1868. This flexibility has resulted in a standard that is "not a difficult one to satisfy." *United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977). And for good reason, since an officer who possesses a reasonable suspicion that a suspect is armed and dangerous should not be denied "the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24, 88 S.Ct. 1868. Applying this standard and considering the officers' testimony, the video evidence, and the factors listed above, the Court concludes that the stop and frisk of Torres was supported by the requisite reasonable suspicion that Torres was engaged in criminal activity and was armed and dangerous. Defendant's motion to suppress is therefore DENIED.

Trial in this matter will commence on June 5, 2017 at 9:30 a.m. in Courtroom 905, Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007. The Court will issue a detailed scheduling order in due course. SO ORDERED.