**UNITED STATES of America,**

v.

**Charles BELL, Defendant.**

5:16–CR–338

United States District Court, N.D. New York.

Signed June 27, 2017

---

HON. RICHARD S. HARTUNIAN, United States Attorney for the Northern District of New York, OF COUNSEL: ROBERT S. LEVINE, ESQ., Ass't United States Attorney, 100 South Clinton Street, Syracuse, NY 13261

HON. LISA PEEBLES, Federal Public Defender for the Northern District of New York, OF COUNSEL: RANDI JUDA BIANCO, ESQ., Ass't Federal Public Defender, Attorneys for Defendant, 4 Clinton Square, 3rd Floor, Syracuse, NY 13202

## MEMORANDUM–DECISION and ORDER

DAVID N. HURD, United States District Judge

### I. INTRODUCTION

On November 17, 2016, after a state court suppressed the prosecution's evidence and threw out firearms charges against defendant Charles Bell ("Bell" or "defendant"), the United States of America (the "Government") sought and obtained an indictment charging defendant with new, federal crimes based on the same conduct.

On November 28, 2016, at around 10:30 at night, New York State parole officers conducted a scheduled parole visit at Bell's home, where they arrested him on these federal charges. Defendant was taken to the Onondaga County Justice Center (the

"Justice Center") in downtown Syracuse, New York, where federal agents booked him in for an overnight stay.

At around 9:00 a.m. the next morning, U.S. Marshals Service ("USMS") Deputy Alexander Baker ("Marshal Baker") moved Bell from the Justice Center to the nearby federal courthouse and notified fellow USMS Deputy Ross Richard ("Marshal Richard"), who arranged for defendant's initial appearance before U.S. Magistrate Judge Therese Wiley Dancks at 12:30 p.m. that day.

But instead of just leaving Bell to cool his heels in a holding area at the federal courthouse until that afternoon's scheduled appearance before the magistrate, Marshal Baker and Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Francis Neeley ("Special Agent Neeley") had already planned to make better use of this downtime: they interrogated him, extracting defendant's written confession over the course of the next hour.

With the federal case all buttoned up, Marshal Baker returned Bell to a cell in the holding area, fed him lunch, and then escorted him to courtroom number three, where Judge Dancks waited to warn him about the importance of his constitutional rights and to appoint the Office of the Federal Public Defender ("FPD") to represent him on the charges to which he had just recently finished confessing his guilt.

On February 10, 2017, Bell, through his newly appointed counsel, moved to suppress for a second time the evidence recovered during his initial arrest. This time around, defendant also moved to exclude the inculpatory statement he made to law enforcement agents the morning after his re-arrest on the federal charges. The Government opposed both branches of defendant's motion. After a review of the parties' briefing, an evidentiary hearing was ordered to determine the circumstances surrounding law enforcement's procurement of defendant's statement.

On April 6, 2017, that evidentiary hearing was conducted in Utica, New York, where the parties stipulated to the admission of four exhibits, including an audio recording of Bell's interrogation. In addition, the Government introduced testimonial evidence from three witnesses: Marshal Richard, Marshal Baker, and Special Agent Neeley.

At the conclusion of the hearing, the parties were directed to review the transcript and to submit proposed findings of fact and conclusions of law. Those submissions have been received and have been reviewed together with the transcript. Both branches of Bell's suppression motion are now fully briefed.

## II. BACKGROUND [1]

The evening of September 23, 2015, two Syracuse Police Department detectives and a member of the U.S. Marshals Service were jointly patrolling the east side of the City of Syracuse, New York. The trio were riding in an unmarked Chevrolet Impala, with William Kittell ("Detective Kittell") behind the wheel and Mamoun Abraham ("Detective Abraham") beside him in the front passenger seat. Marshal Baker, also along for the ride, was seated in the back. All three agents were dressed in plain clothes, but they were also wearing

---

1. Bell initially requested an evidentiary hearing in connection with both issues, but the Government maintained that such a procedure would be unnecessary because the motion could be resolved on the basis of the parties' submissions. Because the Court large-ly agreed with the Government's position, it limited the evidentiary hearing to the circumstances surrounding defendant's confession. Consequently, the background recited here is drawn from a review of the parties' original memoranda and attached exhibits.

vests marked "Police" on the front and back.

At around 8:45 p.m., as the agents approached the intersection of Maple and East Genesee streets in their unmarked sedan, they observed a vehicle come to a stop in the middle of the road. According to Detectives Abraham and Kittell, they observed a black male in a dark hooded sweatshirt, later identified as Bell, approach the driver's side of the stopped vehicle and reach his hands inside the car.

Although Detective Abraham claimed that he could somehow manage to make out the shape of Bell's hands through the late September darkness, neither detective actually observed anything illegal occur through the vehicle's window. After a brief moment, the agents observed the pedestrian step back and point to the vehicle's occupants, a gesture the detectives understood as one directing the driver to pull his vehicle over onto Maple Terrace, a nearby side road.

The agents followed their quarry up Maple Street, planning to investigate what they suspected to be an illegal drug transaction in an area known for drug activity. As the agents pulled up in their unmarked car, Bell and another male were standing outside it with their backs turned away from the agents. Although Detective Abraham believed the two men to be inspecting something, he could not identify any items in their hands.

At this point, Detective Abraham exited the unmarked patrol car, startling the two men. Bell took a quick look at Detective Abraham, turned his body away from the agent, and began walking briskly away in

an easterly direction. When Detective Abraham ordered defendant to stop, he fled on foot.

Detective Abraham gave chase, quickly tackling Bell to the ground behind an apartment complex on Maple Terrace and holding him there until Marshal Baker arrived to handcuff him. In the meantime, Detective Kittell activated his unmarked sedan's lights and sirens and stopped the other vehicle, issuing traffic tickets to the driver.

No drugs were recovered in connection with the incident. Instead, after Marshal Baker finished handcuffing Bell, Detective Abraham rolled defendant over on the ground and observed a pearl and white handgun fall from the front pocket of his hooded sweatshirt. Defendant was arrested and transported to the Justice Center for booking, where he made statements that suggested the driver of the vehicle had "set him up." Defendant was later indicted for state law firearms offenses.

On May 6, 2016, following an evidentiary hearing at which Attorney James Hopkins represented Bell, Onondaga County Court Judge Anthony F. Aloi suppressed the evidence recovered the night defendant was apprehended and dismissed the state court indictment against him.

### III. FINDINGS OF FACT [2]

Special Agent Neeley began a federal investigation into Bell shortly after the state law charges were dismissed. Tr. at 57.[3] According to Special Agent Neeley, someone from the U.S. Attorney's Office had contacted his supervisor, who in turn

---

**2.** Based on the evidence presented at the hearing, and having considered the testimony of the Government's three witnesses, the following facts were established by a preponderance of the credible evidence. To the extent any finding of fact may include a conclusion

of law it is deemed to be a conclusion of law, and vice versa.

**3.** Citations to "Tr." refer to the transcript of the suppression hearing.

had instructed him to investigate whether the conduct underlying the now-dismissed state charges against defendant constituted a violation of federal firearms law. Id.

First, Special Agent Neeley contacted Marshal Baker, who was present at Bell's original arrest, and solicited some "brief background" information about defendant's case. Tr. at 7, 19, 58. Special Agent Neeley then obtained certified copies of defendant's prior felony convictions as well as a report from a firearms specialist that confirmed the firearm at issue had been manufactured outside New York State. Id. at 58. Based on this information, Special Agent Neeley informed his supervisor that defendant's case "was worthy of looking at and moving [forward]." Id.

On November 17, 2016, following grand jury testimony by Special Agent Neeley, the Government obtained a two-count federal indictment that charged Bell with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and with possessing a firearm with an obliterated serial number in violation of § 922(k). Tr. at 18, 59. U.S. Magistrate Judge Therese Wiley Dancks issued a warrant for defendant's arrest on these charges the very same day this federal indictment was handed down. Id. at 18.

However, because Special Agent Neeley "lives rather far away from Syracuse," he elected to work with Marshal Baker to arrange for Bell's arrest on these new, federal charges.[4] Tr. at 7. Marshal Baker learned that defendant was on state parole and contacted New York State Parole Officer Brian Mahar ("PO Mahar"), who explained that the parole office had actually scheduled a home visit with defendant during the evening of November 28. Id. at 7–9. Marshal Baker provided PO Mahar with

a copy of defendant's federal arrest warrant and indicated to PO Mahar that, if defendant was home at the time of the parole visit, "he could be arrested on the federal charge." Id. at 8.

On November 28, 2016, at approximately 10:30 p.m., state parole officers arrested Bell at his home pursuant to the federal arrest warrant they received from Marshal Baker. Tr. at 8. The state agents transported defendant to the Justice Center, where USMS Deputy Bob Sweeney ("Marshal Sweeney") took charge of the process of booking defendant on the federal charges. Id. at 8.

Later that same evening, PO Mahar contacted Marshal Baker to inform him that Bell had been arrested. Tr. at 9. Marshal Baker immediately passed this news along to Special Agent Neeley and the two formed a plan to "interview" defendant, if possible, before his initial court appearance the next day. Id. at 39, 79–80.

Between 8:30 and 9:00 a.m. the next morning, Marshal Baker, accompanied by USMS Deputy David Tobian ("Marshal Tobian"), picked Bell up at the Justice Center and drove him the short distance to the Syracuse federal building. Tr. at 9–10. According to Marshal Baker, the two agents had a "short conversation" with defendant, who "was confused as to the charges" and explained to them that "he had beaten the state charges in this case." Id. at 11. Although defendant "wanted to keep talking," Marshals Baker and Tobian told him "he was probably better off if he didn't say anything at that point." Id. The two agents placed defendant in a cell block at the Syracuse federal building and, in Marshal Baker's words, "awaited Special Agent Neeley's arrival." Id. at 12.

---

4. Special Agent Neeley testified that he lived about four hours away from Syracuse. Tr. at

79.

Marshal Baker also contacted Marshal Richard, the USMS member in charge of coordinating court hearings in the Syracuse federal building that day, to confirm that he would be scheduling Bell's required appearance before a magistrate judge.[5] Tr. at 10, 42. According to Marshal Richard, he had recently received an e-mail from court personnel informing him that Judge Dancks was the primary magistrate on duty for the month of November. Id. at 44–45.

At about 9:23 a.m., Marshal Richard sent an e-mail to Suzanne Gunter, Judge Dancks's courtroom clerk, requesting to schedule Bell's initial appearance before Judge Dancks. Tr. at 46. Ms. Gunter's e-mail reply, which came just seven minutes later, explained to Marshal Richard that Judge Dancks was conducting a trial that week and informed him that defendant's initial appearance would occur at 12:30 p.m. in courtroom number three. Id. at 47.

Ms. Gunter's e-mail reply further inquired as to whether Bell had his own counsel and explained that, if not, she would ask someone from the FPD's office to appear with him. Tr. at 47. Ms. Gunter's reply message also expanded the list of participants in the e-mail chain to include Marshal Richard's supervisor, four members of the FPD, and the Assistant U.S. Attorney assigned to defendant's case. Id. at 46–47.

Although Marshal Richard was aware that a different, "backup" magistrate was available to conduct initial appearances in instances where the primary duty magistrate is not available, he did not make any effort to contact either U.S. Magistrate Judge Andrew T. Baxter or U.S. Magistrate Judge David E. Peebles, the two other magistrates whose chambers were also located in the Syracuse federal building. Tr. at 51.

Instead, Bell remained confined in a holding cell until just before 11:00 a.m., when Special Agent Neeley finally arrived at the Syracuse federal building after his four-hour long commute. Tr. at 14. Special Agent Neeley and Marshal Baker immediately moved defendant from the cell block area to a booking area, where Special Agent Neeley began to conduct a recorded interview of defendant. Id. at 28, 32, 62–63.

The audio recording of this interview reveals that Special Agent Neeley spoke for just under fifteen minutes before eventually reading Bell his Miranda rights. Although he collected so-called "pedigree" information from defendant during this initial period, Special Agent Neeley also took this opportunity to explain that defendant had come to his attention because the USMS was involved in his initial arrest, and, in Special Agent Neeley's words, "you don't screw with the Marshals." Special Agent Neeley also informed defendant, among other things, that federal agents enjoyed a "99.9% conviction rate" on firearms offenses and that although defendant would eventually get an attorney, "fancy attorneys won't make a difference" in this case.

Eventually, Bell waived his Miranda rights and, over the course of the next forty-five minutes, produced a written confession. After the hour-long interview, Marshal Baker returned defendant to the holding cell and gave him lunch. Tr. at 16. By that point, it was nearly 12:30 p.m., so Marshal Baker took defendant to Judge Dancks's courtroom, where she appointed the FPD to represent him on the federal charges to which he had just confessed guilt.

---

5. Marshal Richard testified that he already learned of Bell's arrest the prior evening, when Marshal Sweeney e-mailed him to let him know. Tr. at 43.

## IV. CONCLUSIONS OF LAW

■ "On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." United States v. Echevarria, 692 F.Supp.2d 322, 332 (S.D.N.Y. 2010) (quoting United States v. Wyche, 307 F.Supp.2d 453, 457 (E.D.N.Y. 2004)); see also United States v. Matlock, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

### A. Bell's Initial Arrest

First, Bell contends suppression of the evidence recovered on the night of his initial arrest—the handgun and his later, post-arrest statements suggesting the driver of the vehicle "set him up"—is warranted because Detective Abraham violated the Fourth Amendment by seizing defendant without reasonable suspicion. According to the Government, however, observations made by the three agents leading up to the moment Detective Abraham ordered defendant to stop, combined with defendant's decision to then attempt to flee the scene, established reasonable suspicion in this case.

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "As this language indicates, the ultimate measure of the constitutionality of a government search or seizure is reasonableness." United States v. Compton, 830 F.3d 55, 61 (2d Cir. 2016) (quoting United States v. Bailey, 743 F.3d 322, 331 (2d Cir. 2014)).

■ Reasonableness is "generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action." Bailey, 743 F.3d at 331. As relevant here, "[t]he Fourth Amendment's proscription of unreasonable seizures generally prohibits a police officer from seizing an individual absent probable cause to believe that 'an offense has been or is being committed by the person to be arrested.' " United States v. Goines, 604 F.Supp.2d 533, 539 (E.D.N.Y. 2009) (Block, J.) (quoting Dunaway v. New York, 442 U.S. 200, 208 & n.9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)).

■ However, in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "the Supreme Court carved out a limited exception from this general rule, holding that 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.' " Goines, 604 F.Supp.2d at 539 (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). This kind of investigatory stop must be "justified at its inception," Terry, 392 U.S. at 20, 88 S.Ct. 1868, and therefore "events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013) (Pooler, J.).

■ Under Terry, reasonable suspicion exists when a police officer can "point to specific and articulable facts which, taken together with rational inferences from those facts," provide a reasonable basis to believe that the person to be detained is committing or has committed a criminal offense. Terry, 392 U.S. at 21, 88 S.Ct. 1868. This reasonableness determination is guided by several basic principles.

First, "[r]easonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000). Second, courts must remain mindful of the Supreme Court's instruction "not to consider individual facts in isolation," United States v. Delossantos, 536 F.3d 155, 161 & n.5 (2d Cir. 2008), because "the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." United States v. Lee, 916 F.2d 814, 820 (2d Cir. 1990). Third, and relatedly, this "totality of the circumstances" approach requires a court to view the facts "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." Bayless, 201 F.3d at 133 (quoting United States v. Oates, 560 F.2d 45, 61 (2d Cir. 1977)).

Importantly, "[e]ven conduct that is, by itself, lawful or ambiguous and susceptible of an innocent explanation may, under certain circumstances, justify a Terry stop." United States v. Mitchell, 2009 WL 1472834, at *8 (E.D.N.Y. May 27, 2009). In other words, the reasonable suspicion standard is not a demanding one, since "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007) (quoting United States v. Arvizu, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

However, this standard still requires more than an "inchoate and unparticularized suspicion or hunch," United States v. Irizarry, 509 F.Supp.2d 198, 208 (E.D.N.Y. 2007) (citation omitted), and it is inappropriate to "merely defer to the police officer's judgment." Bayless, 201 F.3d at 133; see also Elmore, 482 F.3d at 183 ("Reasonable suspicion is a question of probabilities, not possibilities.").

As an initial matter, the parties dispute the point at which Bell was "seized" for purposes of conducting this reasonable suspicion inquiry. According to defendant, "he was seized, at the very latest, when he was directly ordered to stop as he began to walk away from the scene." Def.'s Mem. at 5. The Government, however, argues that "defendant was seized when [Detective] Abraham caught up to the defendant and tackled him." Gov. Opp'n at 9.

On this threshold question, the Government is correct. In the Fourth Amendment context, "[a] seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009) (quoting United States v. Swindle, 407 F.3d 562, 572 (2d Cir. 2005)).

Bell did not halt in response to Detective Abraham's order to stop and, at that point, the detective had not yet applied any physical force to defendant. Mitchell, 2009 WL 1472834, at *7 ("Clearly, at that point, defendant's freedom was not restrained, considering the fact that defendant walked away from the officers after the officers asked to speak to him.").

Under the circumstances of this case, defendant was not "seized" for purposes of the Fourth Amendment until Detective Abraham made physical contact by tackling him to the ground a short time later. See, e.g., California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain

movement, even when it is ultimately unsuccessful.").

With that issue settled, the Government contends that the underlying observations made by the agents, coupled with Bell's decision to flee in a high-crime area, established reasonable suspicion. However, and as the County Court observed,

> It is clear that the sole basis for the initial approach of the defendant was that he was observed interacting with the driver of a vehicle, in a high crime area, and that the vehicle was positioned in the middle of the intersection in violation of the vehicle and traffic law .... the Court is of the opinion that such observation, even in conjunction with the observations of the defendant and the driver being huddled in the street, did not constitute specific circumstances indicative of criminal activity so as to establish reasonable suspicion ... even when coupled with the defendant's flight from the police.

Ex. A at 9.

The Government has a couple responses to this prior, indisputably adverse determination about the reasonableness of the agents' conduct. First, the Government points out that Judge Aloi's analysis relies on New York State's common law governing police encounters rather than federal constitutional standards.

This position has some relevance. In People v. De Bour, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (N.Y. 1976), the New York Court of Appeals "delineated four levels of permissible police intrusion, the propriety of each depending upon the circumstances presented." Hall v. City of White Plains, 185 F.Supp.2d 293, 299 (S.D.N.Y. 2002); see also People v. Garcia, 20 N.Y.3d 317, 322, 959 N.Y.S.2d 464, 983 N.E.2d 259 (N.Y. 2012) ("The De Bour/Hollman framework sets out four levels of police-citizen encounters and the attendant, escalating measures of suspicion necessary to justify each.").

Notably, De Bour and the Fourth Amendment "draw the line between permissible and impermissible police encounters in different ways; as a result, De Bour is in some respects more protective of liberty from governmental intrusion than the Fourth Amendment, and in other respects less." Davis v. City of N.Y., 959 F.Supp.2d 324, 342 (S.D.N.Y. 2013) (Scheindlin, J.); see also Ligon v. City of N.Y., 2013 WL 227654, at *2 (S.D.N.Y. Jan. 22, 2013) ("[T]he extent to which De Bour conflicts with or complements the Fourth Amendment is unclear.").

■■ "The first De Bour level authorizes a police officer to approach a citizen to request information where there is 'some objective credible reason not necessarily indicative of criminality.'" Hall, 185 F.Supp.2d at 299 (quoting De Bour at 223, 386 N.Y.S.2d 375, 352 N.E.2d 562). Under De Bour, this kind of first-level questioning "should be brief and specific, relating, for example, to an inquiry as to the person's identity, destination or reason for being in the area." Id. (citing People v. Hollman, 79 N.Y.2d 181, 191, 581 N.Y.S.2d 619, 590 N.E.2d 204 (N.Y. 1992)).

■■ "However, once the officer's questioning becomes accusatory and the inquiry focuses upon the possibility of criminality, the stop passes beyond a mere request for information and to the second level, the common-law right to inquire." Hall, 185 F.Supp.2d at 299. Under this second level, "the officer may interfere with a citizen to the extent necessary to gain explanatory information, but may not make a forcible seizure." Id. at 300.

■■ Beyond that, "[t]he third level permits an officer to forcibly stop and detain a person for questioning where the

police officer has reasonable suspicion that a suspect has committed, is committing, or is about to commit a crime." Marcano v. City of Schenectady, 38 F.Supp.3d 238, 253 (N.D.N.Y. 2014) (McAvoy, J.). New York courts have defined this "reasonable suspicion" requirement as the "quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand." People v. Cantor, 36 N.Y.2d 106, 112–13, 365 N.Y.S.2d 509, 324 N.E.2d 872 (N.Y. 1975).

■ "The fourth and final level authorizes a police officer to arrest and take one into custody where the officer has probable cause to believe that the person has committed a crime or an offense in his presence." Hall, 185 F.Supp.2d at 300.

Against this more intricate state law framework, the Government argues Judge Aloi's decision held the state prosecution to a more demanding standard than the one that the federal constitution requires the Government to satisfy in this proceeding.

That argument is rejected. The third and fourth De Bour levels hew closely to the "reasonable suspicion" and "probable cause" requirements drawn from the Fourth Amendment. See, e.g., Ligon v. City of N.Y., 925 F.Supp.2d 478, 491 (S.D.N.Y. 2013) (Scheindlin, J.) ("A Level 3 stop is legally equivalent to a Terry stop, and New York state court opinions generally refer to Level 3 De Bour stops and Terry stops interchangeably.").

■ To be sure, "[t]he conduct forming the basis of reasonable suspicion need not be—and, indeed, often is not—illegal." United States v. Haynesworth, 879 F.Supp.2d 305, 310 (E.D.N.Y. 2012). Yet as the County Court found, at the time Detective Abraham ordered Bell to "stop," neither detective had managed to observe

much of anything that actually occurred between defendant and the occupant of the suspect vehicle. Cf. United States v. McCrae, 2008 WL 115383, at *3 (E.D.N.Y. Jan. 11, 2008) (rejecting an officer's characterization of the defendant's movements as "suspicious" because the officer could "not actually see [the defendant's] hand at all" when it "was in front of [the defendant's] body and [the officer] was looking at [the defendant's] back").

■ Of course, an individual's presence in a "high-crime area" may "properly raise an officer's suspicions of criminality. Mitchell, 2009 WL 1472834, at *8; see also Wardlow, 528 U.S. at 124, 120 S.Ct. 673 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."). And being present in such an area during the late evening or early morning hours may add some "slight support for a reasonable police officer's suspicions to be raised." United States v. Doughty, 2008 WL 4308123, at *4 (S.D.N.Y. Sept. 19, 2008) (collecting cases).

Even crediting these inferences, they are outweighed by the circumstances. Among other things, there is no indication in the record that these law enforcement agents were acting on an informant's tip, possessed any prior familiarity with any of the individuals involved, or had received any additional or advance information related to the vehicle-pedestrian encounter they had witnessed. United States v. Castle, 825 F.3d 625, 636 (D.C. Cir. 2016) (considering relevance of officers' prior experience with the defendant as contributing to the reasonable suspicion analysis). At the point the agents sought to make contact with the pedestrian and/or the vehicle's occupants, they had observed little more than a black male in a hooded sweatshirt approach a stopped vehicle in a rough

area of the city during the early evening hours. See Swindle, 407 F.3d at 569–70 ("[C]ourts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.").

There is, however, a relevant legal distinction between state and federal law that arises under the particular facts here. In cases where a suspect flees, courts in New York State appear to measure De Bour's third level of police intrusion from the point at which pursuit of a suspect begins rather than from the application of physical restraint. Compare, e.g., People v. Holmes, 81 N.Y.2d 1056, 1057–58, 601 N.Y.S.2d 459, 619 N.E.2d 396 (N.Y. 1993) ("Police pursuit . . . must be justified by reasonable suspicion"), and People v. Carmichael, 92 A.D.3d 687, 938 N.Y.S.2d 197 (2d Dep't 2012) (concluding officers lacked "the reasonable suspicion that was necessary to lawfully pursue the defendant" and therefore "the discarded physical evidence should have been suppressed"), with, e.g., Swindle, 407 F.3d at 568 ("[A]n unreasonable order to stop does not violate the Fourth Amendment and that the grounds for a stop may thus be based on events that occur after the order to stop is given."); United States v. Torres, 252 F.Supp.3d 229, 233, 2017 WL 2105985, at *3 (S.D.N.Y. May, 9, 2017) ("[T]he facts supporting reasonable suspicion can be developed in the interim period between the order to stop and the ultimate seizure.").

The Government seizes on this pursuit/seizure distinction to make much of Bell's decision to flee, characterizing it as entirely "unprovoked" and "headlong." That characterization is rejected.

 As a general matter, "[a]n individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not

form the basis for his detention." United States v. Muhammad, 463 F.3d 115, 123 (2d Cir. 2006). However, the Government is correct to claim that the reasonableness of an officer's suspicion may properly be informed by "an officer's observation of flight in a high crime area." Muhammad, 463 F.3d at 122.

The rationale for this principle stems from a recognition that "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." Wardlow, 528 U.S. at 125, 120 S.Ct. 673. Thus, "[w]hile unprovoked flight alone is not enough to justify a Terry stop, the Supreme Court held in Wardlow that flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion." Mitchell, 2009 WL 1472834, at *10.

 With those competing requirements in mind, this case becomes a much closer call. Yet after carefully considering the totality of the circumstances, Detective Abraham's seizure of Bell was not supported by reasonable suspicion.

As Detective Abraham testified, he startled both men when he exited his unmarked patrol vehicle and approached them, in plain clothes, at night, in a "high-crime" area. With their backs turned to him, there is no indication in the record that Bell recognized he had just become part of a *police* encounter—although Detective Abraham was apparently wearing a vest marked "police," he did not identify himself as a law enforcement agent when he ordered defendant to halt, and he did not appear to make any additional verbal attempts to secure compliance before giving chase. Castle, 825 F.3d at 636–37 (observing "critical role that a possible suspect's knowledge of police presence plays in determining whether arguably evasive

action can be part of the totality of the circumstances supporting reasonable suspicion").

Among other things, this conclusion is supported by the fact that the other suspect—the driver of the vehicle—was somehow able to find time to return to it and begin driving away before being forced to stop by Detective Kittell, who eventually activated his lights and sirens after "the involved vehicle" began heading "back in his direction."

In sum, the record reflects that Detective Abraham startled two men in the early evening darkness and, when Bell failed to follow a single command, he gave chase. Cf. Torres, 252 F.Supp.3d at 233–35, 2017 WL 2105985, at *4 (concluding the defendant "was well aware that the individuals in the car were in fact law enforcement officers" even though "the officers were in plainclothes, emerged from an unmarked car, and did not identify themselves as police" because video evidence demonstrated that the defendant had ample time to observe the actions of the unmarked car and chose to flee "as soon as [the detective] exited the vehicle").

■■ The question remains whether exclusion is warranted. Although the Supreme Court has recently reiterated that the rule "does not apply when the costs of exclusion outweigh its deterrent benefits." Utah v. Strieff, —— U.S. ——, 136 S.Ct. 2056, 2059, 195 L.Ed.2d 400 (2016), it remains the best method of deterring "deliberate, reckless, or grossly negligent conduct." Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).[6] Here, considering the particular facts and circumstances of this case, exclusion is warranted. Accordingly, defendant's

motion to suppress the evidence recovered from his initial arrest will be granted.

### B. Bell's Statement

Second, Bell contends the statement he made to Special Agent Neeley and Marshal Baker at the Syracuse federal building following his re-arrest should also be suppressed. According to defendant, the Government unnecessarily delayed in presenting him to a magistrate for his initial appearance and, as a result, coerced him into giving an involuntary confession. The Government argues that the delay in this case was permissible because it resulted from the magistrate judge's scheduling conflict. Further, the Government maintains that the totality of the circumstances in this case demonstrate that defendant's statement was given voluntarily.

### 1. Reasonableness of the Delay

In its present form, Federal Rule of Criminal Procedure 5(a) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." FED. R. CRIM. P. 5(a)(1)(A). Where, as here, a defendant contends that Government agents unreasonably delayed his initial appearance before a neutral magistrate, two sources of authority govern the admissibility of any resulting confessions.

The first source, known as the McNabb–Mallory rule, draws its name from a line of precedent enforcing the common law's "presentment" requirement, an obligation which "tended to prevent secret detention and served to inform a suspect of the charges against him." Corley v. United States, 556 U.S. 303, 306, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) ("The common law obliged an arresting officer to bring his

---

6. When it applies, the rule encompasses both "primary evidence obtained as a direct result of an illegal search or seizure" as well as "evidence later discovered and found to be derivative of an illegality." Utah, 136 S.Ct. at 2061.

prisoner before a magistrate as soon as he reasonably could.").

In McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the Supreme Court for the first time confronted the question of how to enforce a number of different federal statutes in which the common law presentment rule had been codified. See id. at 342, 63 S.Ct. 608. In that case, federal agents had interrogated a group of murder suspects for several days, bringing them before a magistrate only after their confessions had finally been extracted. Id. at 334–38, 344–45, 63 S.Ct. 608. Under those particular facts, the Court exercised its supervisory authority to hold the confessions inadmissible, reasoning they were obtained during an unreasonable delay in presentment. See id. at 347, 63 S.Ct. 608.

Following McNabb, "the combined action of the Judicial Conference of the United States and Congress produced Federal Rule of Criminal Procedure 5(a), which pulled the several statutory presentment provisions together in one place." Corley, 556 U.S. at 307, 129 S.Ct. 1558.

Thereafter, in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the Court applied the now-codified Rule 5(a) to hold inadmissible a confession given by a suspect some seven hours after his arrest, refusing to sanction the "extended delay" in presentment caused by the police, who had detained and questioned him for hours even though "numerous" magistrates were available in the immediate vicinity. Id. at 455, 77 S.Ct. 1356.

Thus, as the Supreme Court explained recently in Corley v. United States, the standard that emerged from these two cases is one that generally renders a defendant's confession—even a voluntary one—inadmissible if it is procured in violation of this presentment requirement; i.e., after an unreasonable delay. See 556 U.S.

at 309, 129 S.Ct. 1558; see also Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 93 L.Ed. 100 (1948) (holding even a voluntary confession is inadmissible if procured after an unreasonable delay in presentment).

The second source of relevant authority on this issue is 18 U.S.C. § 3501, enacted by Congress in an attempt to narrow the broad application of the McNabb–Mallory rule in the lower courts. As relevant here, subsection (c) of § 3501 establishes a safe harbor which bars "suppression based on an unreasonable delay if the confession was made *within six hours* immediately following [the] arrest or other detention." United States v. Gonzalez, 764 F.3d 159, 167 (2d Cir. 2014) (emphasis added).

In other words, § 3501(c) "modified McNabb–Mallory without supplanting it." Corley, 556 U.S. at 322, 129 S.Ct. 1558. As the Ninth Circuit has explained,

> The rule as it stands today is relatively simple to apply. When a criminal defendant brings a suppression motion based on McNabb–Mallory, the district court looks to see whether the confession was obtained within six hours of arrest. If so, McNabb–Mallory does not bar its admission .... If, however, the confession occurred before presentment and beyond six hours, ... the court must decide whether delaying that long was unreasonable or unnecessary ... and if it was, the confession is to be suppressed.

United States v. Gowadia, 760 F.3d 989, 993 (9th Cir. 2014) (citation and internal quotation marks omitted).

Importantly, "[n]either the Supreme Court nor the Second Circuit has held that a delay of over six hours alone requires suppression." United States v. Pena Ontiveros, 547 F.Supp.2d 323, 339 (S.D.N.Y. 2008). Rather, "[t]he determination of whether a delay beyond the six-

hour time limit is unreasonable is necessarily fact specific." United States v. Ramirez, 696 F.Supp.2d 246, 261 (E.D.N.Y. 2010); see also United States v. Boche-Perez, 755 F.3d 327, 338 (5th Cir. 2014) ("The overall reasonableness of a delay will vary city-to-city, case-to-case, justification-to-justification.")

For instance, "[d]elays attributable to routine processing, transportation, overnight lodging, and a defendant's cooperation with authorities have all been found by courts in the Second Circuit to be reasonable." Pena Ontiveros, 547 F.Supp.2d at 339 (collecting cases). Conversely, unreasonable periods of delay include those "solely attributable to the government's desire to investigate other crimes" or in instances where the Government's claimed lack of resources was unpersuasive. Id.; see also Corley, 556 U.S. at 308, 129 S.Ct. 1558 (observing that "delay for the purpose of interrogation is the epitome of 'unnecessary delay'"); Ramirez, 696 F.Supp.2d 246, 261 (E.D.N.Y. 2010) (suppressing statements where investigating officer conducted additional interrogation to "strengthen the criminal case" against defendant).

The parties agree that the delay in this case stretched well beyond § 3501(c)'s six-hour safe harbor. At the very latest, the six-hour clock began ticking around 11:00 p.m. the night of Bell's arrest, when Marshal Sweeney first assumed responsibility for "accepting him as a federal inmate." Tr. at 9; United States v. Umstead, 2016 WL 1383479, at *3 (D. Vt. Apr. 7, 2016) ("As the government asserts, the federal obligation to present a defendant in court cannot arise until the federal government is aware the defendant has been federally arrested or detained.").

The Government's witnesses have also testified credibly to a facially valid reason for this thirteen-and-a-half hour delay:

Judge Dancks's busy morning schedule. See, e.g., United States v. Jacques, 744 F.3d 804, 814 (1st Cir. 2014) ("[A] delay may be reasonable if caused by administrative concerns, such as the unavailability of a magistrate following an arrest."); United States v. Thompson, 772 F.3d 752, 762 (3d Cir. 2014) ("The traditional exceptions to the McNabb–Mallory rule focus on the practical obstacles to getting to a magistrate.").

Indeed, courts routinely accept the unavailability of the magistrate as a permissible reason for delaying a defendant's initial appearance. United States v. Boche–Perez, 755 F.3d 327, 338 (5th Cir. 2014) (observing that a magistrate may be "considered unavailable due to a host of reasons including: a busy docket; a closed court; or other factors, such as distance and weather, that make transportation impractical, futile, and/or dangerous").

But simply identifying a facially valid reason for delay does not necessarily close the door on a defendant's claim of unnecessary or unreasonable delay. "Where there has been a delay beyond six hours, a court should look at how the government agents used the time before a presentment, in particular, whether they employed coercive tactics to obtain a confession." United States v. Anderson, 1996 WL 572085, at *6 (S.D.N.Y. Oct. 7, 1996).

In other words, it is not merely "the lapse of the time but the *use of the time*, when the commissioner or magistrate is unavailable, to employ the condemned psychologically coercive or third degree practices which is proscribed by the [McNabb–Mallory line of] cases." United States v. Marrero, 450 F.2d 373, 376 (2d Cir. 1971) (emphasis added).

For instance, in United States v. Oladokun, 2016 WL 4033166, at *4 (E.D.N.Y. July 27, 2016), the Court declined to find

unreasonable delay where a defendant was held over the weekend by noting, among other things, that "the additional delay was not purposeful or used for an unlawful and coercive interrogation." Id.

Likewise, in United States v. Campo Flores, 2016 WL 5946472, at *10 (S.D.N.Y. Oct. 12, 2016), the Court declined to find unreasonable delay under FED. R. CRIM. P. 5's sister provision regarding arrests made outside the United States by noting, among other things, that there was "no indication that the Government delayed the process or took advantage of any delay" in the transfer of the defendant from Haitian authorities to the DEA. Id. (emphasis added).

Courts in other Circuits have found the Government's use of the delay an important consideration, too. See, e.g., United States v. Mansoori, 304 F.3d 635, 662 (7th Cir. 2002) (finding agent's decision to interview defendant just a few hours before his scheduled arraignment to be unreasonable where no exigent circumstances justified need for interview); United States v. Felton, 2011 WL 1362466, at *9 (D. Alaska Apr. 11, 2011) (finding delay unreasonable by concluding that "while the delay was not purposeful, the agents seized the opportunity for further questioning" and failed to contact "the Court or Clerk's Office to determine if an earlier Court time was possible"); United States v. Wilbon, 911 F.Supp. 1420, 1423 (D.N.M. 1995) (finding delay unreasonable in part because the agent "intentionally exploited the delay in order to extract a confession from the defendant[ ] within an hour before defendant was due to be arraigned").

▮ That is precisely what happened here. The agents took advantage of the

magistrate judge's scheduling delay to attempt to procure a confession, since the agents no doubt knew that the judge would, in accordance with standard presentment procedures, warn Bell about his rights, including the right to remain silent, and appoint counsel for him. Indeed, the parties agree that although there were a number of other judicial officers present in the Syracuse federal building, including at least one "secondary" duty magistrate for the month of November, none of the agents made any attempt to contact them. Tr. at 51.

On this latter issue, United States v. Palacio, 735 F.Supp. 484 (D. Conn. 1990), is instructive. There, the district court faulted the Government's reliance on a magistrate judge's "secretary's decision to schedule the presentment" the next day, concluding that "the government failed to make any effort whatsoever to determine if another magistrate or judicial officer was available to take the presentment upon learning" the first magistrate was unavailable. Id. at 488. ("Even if Magistrate Latimer had been unavailable, the government has not offered any evidence that it sought to present [the defendant] before either of the two federal judges sitting at the Bridgeport Courthouse.").

Conversely, courts have also signaled their approval of efforts by agents to contact more than one judicial officer. See, e.g., United States v. Miller, 2011 WL 63509, at *9 (S.D. Ohio Jan. 6, 2011) (finding delay reasonable where agent testified there were no other judicial officers present in the courthouse during the delay); United States v. Harrold, 679 F.Supp.2d 1336 (N.D. Ga. 2009) (detailing agent's attempts to contact multiple magistrates before interviewing defendant).[7]

---

7. Stretching this analogy, the Ninth Circuit has also rejected a District-wide policy requiring that pre-arraignment paperwork be submitted to the magistrate by 10:30 a.m. as a justification for delay in presentment. United States v. Valenzuela–Espinoza, 697 F.3d 742,

These background facts matter. As the Supreme Court explained in Corley, "presentment is the point at which the judge is required to take several key steps to foreclose Government overreaching: informing the defendant of the charges against him, his right to remain silent, his right to counsel, the availability of bail, and any right to a preliminary hearing; giving the defendant a chance to consult with counsel; and deciding between detention or release." 556 U.S. at 320, 129 S.Ct. 1558.

The evidence in this case strongly suggests that the Government viewed this as its last chance for an easy "win" before Bell could receive the benefit of advice from an attorney. An inference like this one is strengthened where, as here, the agents are aware that a state court had already ordered the suppression of the physical evidence the Government had in its possession.[8]

Notably, other courts have commented on the "troubling" practice of similar "pre-arraignment interviews," especially in the context of indigent defendants, who, unlike wealthier suspects, must remain without the benefit of counsel until such time as they are arraigned. United States v. Gonzalez, 2011 WL 5994791, at *8 (S.D.N.Y. Nov. 30, 2011) (denying suppression where interrogation nevertheless fell within § 3501(c)'s six-hour safe harbor).

Moreover, these background facts make this case easily distinguishable from one like United States v. Lighten, which found that questioning conducted by federal agents the morning after the defendant's arrest was permissible under McNabb–Mallory because the defendant himself "demanded" to speak with the agents by

banging on his cell door the next morning. 2010 WL 3853307, at *2, *5 (W.D.N.Y. Mar. 1, 2010) (Report & Recommendation), adopted by 2010 WL 3834572 (W.D.N.Y. Sept. 29, 2010).

Therefore, although the Government has identified a well-documented "administrative" explanation for the delay in this case, the background circumstances under which the interrogation took place strongly indicate the agents took advantage of the delay with the intent of extracting a confession before counsel could be appointed. This conclusion is bolstered by the fact that no attempt was made to contact either Judge Baxter or Judge Peebles to determine whether further delay might have proved unnecessary. Under the particular facts presented here, the Government violated McNabb–Mallory and Bell's resulting confession must be suppressed.

The suppression of Bell's confession may seem like a relatively drastic remedy, but the Supreme Court and the lower courts have repeatedly emphasized that it remains justified by the incredible significance of a defendant's initial appearance before a neutral magistrate in our criminal justice system. McNabb, 318 U.S. at 347, 63 S.Ct. 608 ("The history of liberty has largely been the history of observance of procedural safeguards."); United States v. Mansoori, 304 F.3d at 662 ("The prompt-appearance requirement serves to protect the defendant's rights and to interpose a check on law enforcement zeal by ensuring the timely intervention of a judicial officer who can confirm that the defendant has been advised of his rights ...."). Accord-

---

751 (9th Cir. 2012) ("An internal policy agreed upon by prosecutors and magistrate judges cannot trump the requirements of a federal statute and the Federal Rules of Criminal Procedure.").

8. On cross-examination, Special Agent Neeley testified that he had been "advised as to why the case in the state [court] was dismissed." Tr. at 77.

ingly, Bell's motion to suppress his re-arrest statement will be granted.

## 2. Voluntariness of the Eventual Waiver

Even assuming the presentment delay in this case could somehow be considered "reasonable" under McNabb–Mallory, the testimony of the Government's witnesses viewed in light of the particular facts surrounding Bell's interrogation demonstrate that the agents manipulated defendant's re-arrest in a manner calculated to circumvent his right to counsel, circumstances which render his eventual Miranda waiver invalid.

■ "[T]he accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement." Berghuis v. Thompkins, 560 U.S. 370, 382, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (quoting N. Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)); see also United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014) ("The government bears the burden of proof.").

■ "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." United States v. Haak, 215 F.Supp.3d 218, 233 (W.D.N.Y. 2016) (quoting Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)).

■ "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after a careful evaluation of the totality of the surrounding circumstances." Haak, 215 F.Supp.3d at 233 (quoting Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988)); see also Taylor, 745 F.3d at 23 ("We look at the totality of circumstances surrounding a Miranda waiver and any subsequent statements to determine knowledge and voluntariness.").

■ "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Haak, 215 F.Supp.3d at 233 (quoting Green, 850 F.2d at 901–02). "[A] single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of the circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." Id.

■ In this case, as in many cases like it, Special Agent Neeley guided Bell through the process of acknowledging his Miranda rights on a convenient printed form, waiving those rights, and then producing a written confession. Cf. Taylor, 745 F.3d at 23 ("In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived Miranda rights.").

Further, as the parties agree and the Government is quick to emphasize, this iteration of the waiver process did not occur under any overtly threatening circumstances; e.g., there is no indication that either agent verbally or physically abused Bell or made any wholly misleading promises to induce defendant's confession. See United States v. Plugh, 648 F.3d 118, 128 (2d Cir. 2011).

Even so, there are troubling aspects to this story. And while the Government has done its best to push these concerns to the

margins, they bear on second and third sets of circumstances contemplated by Green.

"The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion. Indeed, the Fifth Amendment privilege is not concerned with moral or psychological pressures to confess emanating from sources other than official coercion. The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." United States v. Shehadeh, 940 F.Supp.2d 66, 71 (E.D.N.Y. 2012) (quoting Colorado v. Connelly, 479 U.S. 157, 169–70, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).

First, as set forth above, Special Agent Neeley spent just shy of fifteen minutes laying out for Bell the hopelessness of his present situation before finally getting around to asking him whether he would like to waive his rights. To be sure, a good piece of this exchange involved permissible subjects and permitted Special Agent Neeley to gather identifying information. However, Special Agent Neeley also represented to defendant that he had a made mistake by "screw[ing] with the Marshals." According to Special Agent Neeley's lengthy preamble, this mistake was a serious one—so serious, in fact, that although defendant would eventually get an attorney in his federal case, Special Agent Neeley assured defendant that "fancy attorneys won't make a difference" this time around.

It was improper for Special Agent Neeley to state that an attorney would be unable to help Bell, and it was unacceptable to suggest that the "eventual" appointment of an attorney to represent him was nothing more than some sort of pro forma legal requirement. Cf. United States v. Anderson, 929 F.2d 96, 97 (2d Cir. 1991) (Cardamone, J.) (affirming suppression where government agent told defendant that "this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. attorney or anyone else to tell them how much [you] cooperated with us").

Further, this statement from Special Agent Neeley, considered in light of other testimony from the Government's witnesses, readily supports an inference that both Marshal Baker and Special Agent Neeley were well aware of Bell's prior, state court representation and were keen to prevent the same result in this new proceeding, at least until they had taken a crack at securing his confession.

For instance, Marshal Baker testified that he could readily recall that Bell expressed confusion about his re-arrest, repeatedly sought to explain to the agents that he had "beaten the state charges in this case," and "wanted to keep talking" during the time in which Marshals Baker and Tobian drove him to the Syracuse federal building the morning of the interrogation. Tr. at 11.

Yet despite possessing a clear, accurate memory of those facts, on cross-examination Marshal Baker suffered from an inability to remember other aspects of this exchange that would certainly have proven relevant to a law enforcement official:

Q. And you had a discussion because he was, I believe your testimony on direct, correct me if I am wrong, was that my client was confused about why he was being arrested on these charges?

A. That's correct.

Q. And he had told you these charges had been dismissed?

A. He told me the state weapons charges had been dismissed.

Q. And he told you, call my lawyer, Jim Hopkins, didn't he?

A. I don't recall if he said that or not.

Q. Well, he did say that he had proof that the charges were dismissed, didn't he?

A. I don't recall those exact words, no.

Q. Wasn't he saying something about his lawyer, to contact his lawyer, Jim Hopkins, or if he can call Jim Hopkins?

A. I don't recall him saying that, no, ma'am.

Q. You don't recall or are you certain that he didn't say that or you just don't recall?

A. I don't remember it.

Tr. at 24–25.

Marshal Baker's gap in recollection would not be particularly noteworthy but for the fact he unambiguously testified that he knew that James Hopkins, in particular, was a criminal defense attorney in the Syracuse area:

THE COURT: Mr. Baker, just a couple of questions to clarify. Did you know that Attorney James Hopkins represented the defendant in the state court action?

THE WITNESS: I didn't know who his attorney was, no, Judge.

THE COURT: Do you know James Hopkins, who he is?

THE WITNESS: I do, yes.

. . . .

THE COURT: I have just one question here. You testified when asked that you could not recall whether the defendant, Mr. Bell, had said that James Hopkins was his lawyer when you were talking about it. Is that the fact, you can't recall that?

THE WITNESS: I don't remember that specifically, no, Judge.

THE COURT: Isn't that very important though because if he said that to you, that he had a lawyer, under all of the rules, you are supposed to stop questioning him; isn't that correct?

THE WITNESS: Yes, sir.

THE COURT: And wouldn't that be something that you would remember, if somebody who you were planning to interview, as you said, said to you I am represented by the same lawyer that represented me in the very same fact situation in state court, couldn't you give me an answer yes or no? And you are just saying you can't remember.

That's—I want to tell you, Mr. Baker, that is troubling to me, but we will move on.

Tr. at 39–40.

Simply put, Marshal Baker's responses to this line of questioning strain credulity. He had already testified in detail about Bell's understandable confusion regarding his late night re-arrest as well as defendant's desire to "keep talking" to the agents. He had already testified to at least a general awareness of James Hopkins's identity and reputation in the Syracuse area. With those factors in mind, a simple "yes" or "no" to this line of questioning would have rendered his testimony far more credible.

This problem is compounded by Special Agent Neeley's "fancy attorney" comment and other, somewhat contradictory testimony:

Q. Would it have mattered to you if he had a lawyer on this very same gun that is charged in federal court as in state court, would it have mattered?

. . . .

A. If he had had a lawyer in the federal arrest, I would not have interviewed the defendant. He did not have a lawyer for this federal arrest according to the Marshal Service, so we conducted an interview.

Q. Oh, he did not have a lawyer according to the Marshal Service, is that your testimony?

A. That's my understanding, yes.

Tr. at 84.

Of course, if this statement by Special Agent Neeley referred to something he had learned from Marshal Baker, then the latter's answer about whether Bell ever invoked the name of his attorney should simply have been "no." And while it is possible that Special Agent Neeley were referring to some other member of the USMS, Marshal Richard, the Marshal in charge of sorting out defendant's initial appearance that morning, also suffered from some troubling failures of recollection that seemingly relate to any attempt by court personnel to investigate whether defendant might already have counsel. For example:

Q. Okay, and [Ms. Gunter] asked you if he had a lawyer already, to let her know, correct?

A. Yes.

Q. Well, did anyone advise you that Mr. Bell had been represented by James Hopkins on an underlying case?

A. Not to my knowledge. I can't recall.

. . . .

Q. But the information you clearly got from Suzanne Gunter, the Clerk, was that if he doesn't have a lawyer, the Federal Public Defenders were going to be assigned, correct?

A. Yes.

Q. And you relayed that information to Marshal Baker, correct?

A. I can't recall who I told about that.

Q. Did you relay that information to [Special] Agent Neeley?

A. No.

Q. When you received the e-mail that the FPD, Federal Public Defender, was going to be assigned, did you forward that e-mail to anyone else when you received that information?

A. No.

Q. You are unsure if you told Marshal Baker that the FPD was going to be on the case?

A. I can't recall, No.

. . . .

Tr. at 49–50.

In sum, the law enforcement agents' conduct in this case strongly indicates there was a concerted, conscious effort to ensure that an attorney did not enter the picture just yet. As Marshal Richard eventually conceded:

THE COURT: And the e-mail you got back [from Ms. Gunter] at this time, they said if the defendant already has his own counsel, please let me know. Did you let the clerk know whether or not he had an attorney?

THE WITNESS: I took it as if I knew he had an attorney, to let her know at that point.

THE COURT: In other words, did you answer the question here that the clerk wanted to know, whether the defendant has his own counsel, please let me know, and did you let them know, yes or no?

THE WITNESS: No.

THE COURT: You never answered that question.

THE WITNESS: I never did, no.

THE COURT: Did you have make any inquiries or ever attempt to find out the answer to that question?

THE WITNESS: No.

. . . .

THE COURT: Did you make any attempt to find out whether this defendant was represented by counsel?

THE WITNESS: That day, I don't recall if I called anybody.

THE COURT: And you also see that the number for the Public Defenders were included on that e-mail. Wouldn't that indicate to you that he would be represented by the Public Defenders at the time of the arraignment?

THE WITNESS: Yes.

THE COURT: Did you relay that information on to either Special Agent Neeley or Deputy Baker?

THE WITNESS: I don't recall that day.

Tr. at 52–53.

It is recognized that under controlling precedent, the Sixth Amendment right to counsel is of relatively limited reach. See, e.g., Claudio v. Scully, 982 F.2d 798, 801 (2d Cir. 1992) ("The New York Court of Appeals has consistently interpreted the right to counsel under the New York Constitution more broadly than the Supreme Court has interpreted the federal right to counsel."); see also United States v. Oehne, 698 F.3d 119, 123 (2d Cir. 2012) (observing that the federal right to counsel is "offense specific" and rejecting defendant's contention that he invoked it by "inform[ing] the officers that he had a lawyer for an unrelated charge").

However, the case law also contemplates the possibility that, at least in certain circumstances, a deliberate or concerted attempt to prevent or discourage the invocation of the right counsel may itself result in a violation. Cf. United States v. Mapp, 170 F.3d 328 (2d Cir. 1999) (declining to adopt Ninth Circuit rule but suggesting that improper collusion by state and federal authorities in a manner calculated to deprive an individual of his right to counsel, such as by voluntarily dismissing state charges in favor of federal ones, might violate the Sixth Amendment).

In sum, the Court is unwilling to stand idly by where, as here, the facts indicate that law enforcement agents manipulated the circumstances surrounding Bell's rearrest in order to secure an opportunity to elicit a confession before the FPD could advise him about whether that course of action might be desirable as a legal matter. With everything that led up to the moment of his eventual confession, a careful evaluation of the totality of the circumstances leads to the conclusion that the agents discouraged defendant from invoking his right to counsel until they could stage a last-minute interrogation under coercive conditions in which "fancy attorneys" would not make a difference. Under those conditions, defendant's Miranda waiver was invalid.

## V. CONCLUSION

Bell's flight in the moments before his initial arrest does not provide sufficient additional indicia to support a finding of reasonable suspicion. Further, under the particular circumstances of this case, the Government unreasonably delayed in presenting defendant to a neutral magistrate, resulting in a confession procured by virtue of an invalid Miranda waiver.

Therefore, it is

ORDERED that

Defendant Charles Bell's motion to suppress is GRANTED.

IT IS SO ORDERED.